IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Lewis T. Babcock, Chief Judge

Civil Case No. 05-cv-00783-LTB-CBS

TMJ IMPLANTS, INC.,

Plaintiff,

v.

AETNA, INC.; CIGNA CORPORATION; CONNECTICUT GENERAL CORPORATION; CONNECTICUT GENERAL LIFE INSURANCE COMPANY; CIGNA DENTAL HEALTH, INC.; CIGNA HEALTH CORPORATION; HEALTHSOURCE, INC.; CIGNA DENTAL HEALTH OF COLORADO, INC.; and CIGNA HEALTHCARE OF COLORADO, INC.,

Defendants.

_____

MEMORANDUM OPINION AND ORDER
_____

Babcock, C.J.,

The plaintiff, TMJ Implants, Inc. ("TMJI"), filed suit in Colorado state court against Aetna, Inc. ("Aetna") and what I will refer to as the CIGNA Defendants – CIGNA Corporation ("CIGNA"); Connecticut General Corporation; Connecticut General Life Insurance Company; CIGNA Dental Health, Inc.; CIGNA Health Corporation; Healthsource, Inc.; CIGNA Dental Health of Colorado, Inc.; and CIGNA Healthcare of Colorado, Inc. – alleging defamation and publication of an injurious falsehood (also known as "commercial disparagement"), tortious interference with prospective business relations, and tortious interference with contractual relations. Defendants Aetna and CIGNA removed to this Court. All of the defendants now move for dismissal pursuant to Fed. R. Civ. P. 12(b)(6). I have had the benefit of the parties'

briefs and of oral argument.  For the reasons stated below, I GRANT the CIGNA Defendants' motion to dismiss and GRANT Aetna's motion to dismiss.

## I. Allegations

The allegations of TMJI's Amended Complaint are substantially the following.  TMJI manufactures total and partial implants for the temporomandibular joint, located in the jaw.  It operates under the auspices of patents belonging to its founder, Robert W. Christensen, D.D.S..  Dr. Christensen has been manufacturing and marketing the implants commercially since 1961 and TMJI has been doing so since 1989.  Dr. Christensen and TMJI, in succession, sold the devices pursuant to a grandfather clause of the Medical Device Amendments of 1976 to the Food, Drug, and Cosmetic Act ("1976 Amendments").  In 1994, after the failures of devices similar to TMJI's prostheses, the Food and Drug Administration ("FDA") began requiring pre-market approval of the devices.  A study commenced in 1996 and ended with FDA approval in 2001.  Doctors around the United States have implanted approximately 25,000 of the devices.  A registry of temporomandibular device implantations includes 3,218 entries for TMJI's devices.

TMJI alleges that Aetna, beginning on or before February 17, 2004, has published to its insureds, to health care providers, and to the public a clinical policy bulletin, numbered 0028 ("CPB 28"), stating that the "Christensen total TMJ prosthesis" is "experimental and investigational for diagnosis and treatment of TMJ disorders" and that use of the total and partial devices is "considered experimental and investigational."  Amended Complaint, 8-9.  In CPB 28 Aetna allegedly compares the TMJI total prosthesis unfavorably to the device of a competitor, TMJ Concepts ("Concepts"), and implies equivalence between it and devices that either have proven ineffective or have been removed from the market.  It characterizes the "evidence from

published clinical studies of the safety and effectiveness of partial joint prostheses in the treatment of [temporomandibular disorders]"as "inadequate," the requisite clinical data as lacking, and the information submitted to the FDA as "limited".  Amended Complaint, 9.  In addition, it denies that any information submitted to the FDA has been published in a peer-reviewed journal.  CPB 28 also allegedly contains false or misleading statements of Dr. Daniel Laskin, unfavorable to TMJI and the FDA approval process to which its device was subjected.

TMJI alleges that one or more of the CIGNA Defendants (it is not clear which), beginning on or before September 15, 2004, has published to its insureds, to health care providers, and to the public a coverage position document, numbered 0156 ("CPN 156"), which also contains allegedly defamatory statements.  Among these are that CIGNA does not cover implantation of TMJI devices because they are experimental, investigational, or unproven and that "[t]here is insufficient evidence in the published medical literature to establish the clinical efficacy or long-term outcome of implantation of partial TMJ prostheses."

Aetna and the CIGNA Defendants allegedly have published these statements through the word wide web.  They knew or should have known that the statements were defamatory.  Their statements caused potential customers of TMJI to doubt the efficacy of TMJI devices and have so caused TMJI to suffer damages in the form of lost sales and lost profits.  Aetna and CIGNA refuse to disavow their statements.

## II. The statements

The parties have produced copies of CPB 28 and CPN 156, which I consider because TMJI has referred to them in its Amended Complaint and because they are central to its claims. *MacArthur v. San Juan County*, 309 F.3d 1216, 1221 (10th Cir. 2002), *cert. denied* 539 U.S. 902

(2003). "Mere legal conclusions and factual allegations that contradict such a properly considered document are not well-pleaded facts that the court must accept as true." *GFF Corp. v. Associated Wholesale Grocers*, 130 F.3d 1381, 1385 (10th Cir. 1997). "If the rule were otherwise, a plaintiff with a deficient claim could survive a motion to dismiss simply by not attaching a dispositive document upon which the plaintiff relied." *Id.*

TMJI argues that I should not consider the proffered bulletins because they have suffered amendment since their initial publication. However, it disputes neither the current dissemination of the documents nor their authenticity. Indeed, TMJI itself has produced three iterations of Aetna's CPB 28 and a copy of CIGNA's CPN 156. TMJI's proffered versions of CPB 28 do not differ from Aetna's proffer in any material respect, except as noted below, and Aetna does not dispute the authenticity of the various iterations. Some terms are abbreviated in some versions and spelled out in others. In one version, Aetna denies coverage for all "Alloplastic implants other than the TMJ Concepts prosthesis which is FDA approved" and in other versions it denies coverage to the "Christensen total TMJ prosthesis." As far as TMJI's interests are implicated, the two declarations mean the same thing. Later versions contain greater detail than an earlier version, as I have set forth below.

No discernable differences appear between the version of CPN 156 that TMJI has provided and the version that the CIGNA Defendants proffer. Neither party disputes the authenticity of any portion of the document.

TMJI does not assert that the defendants have proffered inoffensive versions of the publications. To the contrary, TMJI argues that the documents "are actually worse than" the summaries it has provided in the Amended Complaint. Plaintiff's Amended Combined Response

4

to Aetna's and CIGNA's Motions to Dismiss ("TMJI Response"), 6 n.1.  Any discrepancies that have intruded over time are, therefore, immaterial to the issue before me.

Aetna proffers, in addition to CPB 28 itself, a copy of the disclaimers to which users must accede before viewing the document on its web site.  As TMJI properly points out, these disclaimers do not constitute any part of the documents of which TMJI complains, so I cannot consider them without converting these motions into motions for summary judgment, which I decline to do at this stage in the proceedings.

CPB 28 "expresses Aetna's determination of whether certain services or supplies are medically necessary, experimental and investigational, or cosmetic."  CPB 28, 1.  The explanation continues,

> Aetna has reached these conclusions based upon a review of currently available clinical information (including clinical outcome studies in the peer-reviewed published medical literature, regulatory status of the technology, evidence-based guidelines of public health and health research agencies, evidence-based guidelines and positions of leading national health professional organizations, views of physicians practicing in relevant clinical areas, and other relevant factors). ... The discussion, analysis, conclusions and positions reflected in this Bulletin, including any reference to a specific provider, product, process or service by name, trademark, manufacturer, constitute Aetna's opinion and are made without any intent to defame. Aetna expressly reserves the right to revise these conclusions as clinical information changes, and welcomes further relevant information including correction of any factual error. ... The conclusion that a particular service or supply is medically necessary does not constitute a representation or warranty that this service or supply is covered (i.e., will be paid for by Aetna) for a particular member.

*Id*.  Having thus characterized the statements that follow as matters of opinion, Aetna continues its disclaimers by stating,

> Most Aetna HMO plans exclude coverage for treatment of temporomandibular disorders (TMD) and temporomandibular joint (TMJ) dysfunction, and may also exclude coverage for other services described in this bulletin (e.g., non-surgical management).  The plan determines the scope of coverage. ... For plans that cover treatment of TMD and TMJ dysfunction, requests for TMJ surgery require review by Aetna's Oral and Maxillofacial

5

Surgery patient management unit.

*Id.*

CPB 28 lists several treatments for TMJ disorders, grouping them into non-surgical and surgical categories. Among those non-surgical remedies that Aetna considers medically necessary are reversible intra-oral appliances, physical therapy, and cognitive behavioral therapy. Various surgical procedures also receive the medically-necessary designation. Then follows a list of a few dozen treatments and procedures that Aetna considers "experimental and investigational for diagnosis and treatment of TMJ disorders." Among these are the "Christensen total TMJ prosthesis" and "Partial TMJ prosthesis." *Ibid* at 4-5.

In a section of CPB 28 titled "Background," Aetna explains its conclusions. A November 17, 2003 version of the bulletin states,

> There is inadequate evidence of the safety and effectiveness of partial joint prostheses in the treatment of TMD. The [FDA] Dental Products Advisory Panel reviewed clinical studies of the Christensen fossa prosthesis, and advised the FDA to approve the total prosthesis, but to not approve the partial joint prosthesis because of a lack of clinical data on its safety and effectiveness. Although additional data was submitted to the FDA for approval, the information is uncontrolled and has not been published in a peer-reviewed journal.

Later versions, which the parties have produced, explain in greater detail. After identifying the partial TMJ prostheses in question as the "Christensen fossa-eminence prosthesis, TMJ, Inc., Golden, CO," Aetna states,

> There is inadequate evidence from published clinical outcome studies of the safety and effectiveness of partial joint prostheses in the treatment of [temporomandibular disorders]. The [FDA] Dental Products Advisory Panel reviewed clinical studies of the Christensen fossa prosthesis, and advised the FDA to approve the total prosthesis, but to not approve the partial joint prosthesis because of a lack of clinical data on its safety and effectiveness. The information submitted to the FDA on the safety and effectiveness of the partial TMJ prosthesis is limited and has not been published in a peer-reviewed journal. In an editorial,

6

> Laskin (2001), former editor-in-chief of the Journal of Oral and Maxillofacial Surgery, the official journal of the American Association of Oral and Maxillofacial Surgeons, commented on the data on the TMJ prosthesis presented to the FDA Dental Advisory Panel:
>
>> At that meeting [of the FDA Dental Products Advisory Panel where the partial TMJ prosthesis was considered] the FDA staff presentation expressed concern regarding the lack of data on the effect of the natural condyle articulating against a metal fossa, the limited number of patients with long-term follow-up, and the broad diagnosis of internal derangement as an indication for its use. The panel expressed similar concerns about these issues, as well as the fact that the registry data provided in support of the product did not include all the patients treated and the sample size was insufficient for each of the individual indications. They recommended clarification of the patient inclusion criteria on the clinical study, evaluation of failures and additional patient follow-up, more clearly-defined indications for use of the device, and that a power analysis of the clinical data be done to place the [pre-market approval] in an approvable form. However, despite these criticisms, and the panel's opinion that adequate safety ad effectiveness data for the given surgical indications were lacking, the device was approved for distribution in February 2001.
>
> Laskin (2001) concluded that "there are insufficient data" to answer questions about the safety and effectiveness of the partial TMJ prosthesis. "For example, how reliable are clinical data based on a registry that did not include all patients treated with the device, in which there was a very small number of total patients with serial data and even smaller numbers in each diagnostic subcategory, and where in 1 group of 97 patients with a diagnosis of internal derangement and/or inflammatory arthritis, only 30% (12 subsets) had a follow-up of 3 or more years and 70% were either lost to follow-up, withdrawn, or potentially lost to follow-up. How can one make an informed decision with such information?"

*Ibid* at 6.

As for the TMJI total prosthesis, Aetna reports comparative findings that support its

conclusion that the device is "experimental and investigational."

> Aetna considers the Christensen total joint prosthesis experimental and investigational because it has not been shown to be as effective as the TMJ Concepts total joint prosthesis. An evaluation study has reported significantly better post-surgical outcomes with the TMJ Concepts total joint prosthesis than the Christensen total joint prosthesis. Wolford, et al. (2003) reported the results of a study comparing the Christensen total joint prosthesis (TMJ Inc., Golden CO) with the TMJ Concepts total joint prosthesis (TMJ

> Concepts, Inc., Camarillo, CA) in 45 patients, 23 of whom were treated with the Christensen prosthesis, and 22 of whom were treated with the TMJ Concepts Prosthesis. The investigators reported that, although subjects treated with either total joint prosthesis showed good skeletal and occlusal stability, the subjects treated with the TMJ Concepts Prosthesis had statistically significant improved outcomes compared to subjects treated with the Christensen prosthesis with respect to post-surgical incisal opening (37.3 mm versus 30.1 mm, $p = 0.008$), pain (decrease of 3.1 versus 1.8 on 10 point visual analog scale score, $p = 0.042$), jaw function (improvement of 3.0 versus 1.2 on a 10 point scale $p = 0.008$), and diet (2.0 versus 1.8 on a 10 point scale, $p = 0.021$). The investigators concluded "[a]s a result of out study, it appears that [TMJ Concepts Prosthesis] provides a more biologically accepted and functional prosthesis than the [Christensen prosthesis] for the complex TMJ patient."
>
> Certain other total joint prostheses, such as the Vitek-Kent total joint prosthesis (Vitek Inc, Houston, TX) and silastic implants, are not considered medically necessary as they have been removed from the market due to poor biocompatibility, increased wear, fragmentation, and foreign body giant cell reaction.

*Ibid* at 6.

CPN 156 identifies the therapies that the CIGNA Defendants cover and under what circumstances. It states, "CIGNA HealthCare does not cover partial joint replacement with the Christensen Fossa Eminence Prosthesis (TMJ Implants, Inc.) Partial TMJ Replacement System because it is considered experimental, investigational or unproven." CPN 156, 2. The document discloses that both Concepts' total prosthesis and TMJI's partial prosthesis have received FDA pre-market approval. It goes on,

> The Christensen Fossa Eminence Prosthesis (TMJ Implants, Inc.) Partial TMJ Replacement System received FDA [pre-market] approval in 2001 for any of the following indications:
> • inflammatory arthritis involving the temporomandibular joint not responsive to other modalities of treatment
> • recurrent fibrosis and/or bony ankylosis not responsive to other modalities of treatment
> • failed tissue graft
> • failed alloplastic joint reconstruction
> • internal derangement confirmed to be pathological in origin by both clinical observation and radiographic findings, where the patient has moderate to severe

> pain and/or disabling dysfunction and has not responded to less invasive, conventional therapy
>
> A study published in 2004 (Park) evaluating surgical outcome and surgical morbidity reported that the TMJ metal fossa-eminence partial prosthesis provided significant pain relief and reduced TMJ dysfunction secondary to advanced arthritis. This was a retrospective case series, however, with information gathered from patient questionnaires and chart review. The researchers concluded that rigorously controlled prospective studies are needed to further investigate this procedure. There is insufficient evidence in the published medical literature to establish the clinical efficacy or long-term outcome of implantation of partial TMJ prostheses.

CPN 156, 4-5. Though CPN 156 mentions the Wolford study's findings with respect to Concepts' device, it does not disclose the comparative findings of the study.

### III. Discussion

Under Fed. R. Civ. P. 12(b)(6), a district court may dismiss a complaint for failure to state a claim upon which relief can be granted if it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief. *Conley v. Gibson*, 355 U.S. 41, 45-46, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957). If the plaintiff has pled facts that would support a legally cognizable claim for relief, a motion to dismiss should be denied. *Id*. In evaluating a 12(b)(6) motion to dismiss, "all well-pleaded factual allegations in the . . . complaint are accepted as true and viewed in the light most favorable to the nonmoving party." *Sutton v. Utah State Sch. for the Deaf & Blind*, 173 F.3d 1226, 1236 (10th Cir. 1999).

TMJI invokes two distinct causes of action: defamation and commercial disparagement. Defamation in Colorado consists of 1) a defamatory statement; 2) published to a third party; 3) with fault amounting to at least negligence on the part of the publisher; and 4) either actionability of the statement irrespective of special damages or the existence of special damages to the plaintiff caused by the publication. *Williams v. District Court*, 866 P.2d 908, 911 n.4 (Colo.

1993); *Quigley v. Rosenthal*, 43 F. Supp. 2d 1163, 1175 (D. Colo. 1999), *rev'd in part on other grounds*, 327 F.3d 1044 (10th Cir. 2003), *cert. denied sub nom.*, *Anti-Defamation League v. Quigley*, 540 U.S. 1229, 124 S. Ct. 1507, 158 L. Ed. 2d 172 (2004). If the plaintiff is a public figure or the topic of the statement a matter of public concern, then the plaintiff must demonstrate actual malice, that is, that the publisher acted with knowledge of the statement's falsity or with reckless disregard of its truth or falsity. *Quigley*, 43 F. Supp. 2d at 1175; *Diversified Management v. Denver Post*, 653 P.2d 1103, 1106 (Colo. 1982).

A claim for disparagement requires demonstration of 1) a false statement; 2) published to a third party; 3) derogatory to the plaintiff's title to his property or its quality, to his business in general or to some element of his personal affairs; 4) through which defendant intended to cause harm to the plaintiff's pecuniary interest or either recognized or should have recognized that it was likely to do so; 5) malice; and 6) special damages. *Thompson v. Maryland Cas. Co.*, 84 P.3d 496, 507 n.16 (Colo. 2004); *Williams v. Burns*, 540 F. Supp. 1243, 1247-1248 (D. Colo. 1982).

Both claims must be read in light of the First Amendment to the United States Constitution, which provides, "Congress shall make no law... abridging the freedom of speech... ." The First Amendment protects commercial speech, though not commercial speech that is false or misleading. *Friedman v. Rogers*, 440 U.S. 1, 9, 99 S. Ct. 887, 59 L. Ed. 2d 100 (1979). "Untruthful speech, commercial or otherwise, has never been protected for its own sake." *Id.*

**A.     Aetna's statements**

Aetna argues that its statements were not capable of derogatory meaning and therefore TMJI has failed to state claims for defamation and commercial disparagement. Aetna also argues that its statements constituted opinions on a matter of public concern, protected under Colorado

10

tort law and the First Amendment.

### 1. Derogatory meaning

For its first proposition, Aetna cites *Neurotron Inc. v. Medical Serv. Ass'n of Pa.*, 254 F.3d 444 (3d Cir. 2001). In that case, the Third Circuit considered the district court's grant of summary judgment to defendants in a defamation suit on three alternative grounds: first, that the defendants' statement that the plaintiff's product had "no proven clinical utility" was not disparaging, second, that the statement was privileged and, third, that the record would not support a finding that the defendants knew their statement to be false or acted in reckless disregard of its falsity. *Id*. at 447. The appeals court affirmed because it agreed with the district court's third finding and did not opine on the other two grounds. So, the decision does not assist Aetna on this point.

Though TMJI chose not to address this part of Aetna's argument, the Restatement provides assistance. It states, "A communication is defamatory if it tends to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." Restatement (Second) of Torts § 559 (1977). The Colorado courts have adopted this recitation. *Burns v. McGraw-Hill Broadcasting Co.*, 659 P.2d 1351, 1357 (Colo. 1983); *Pittman v. Larson Distributing Co.*, 724 P.2d 1379, 1387 (Colo. App. 1986). TMJI alleges that Aetna's comments deterred third persons from dealing with it. Therefore, I cannot say as a matter of law that the words are incapable of having that effect.

### 2. Privileged opinion

Whether the statements constitute opinions or actionable statements of fact is a question of law. *Rinsley v. Brandt*, 700 F.2d 1304, 1309 (10th Cir. 1983). The parties, who have given

their careful attention to this issue, agree that the controlling authority is *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 110 S. Ct. 2695, 111 L. Ed. 2d 1 (1990), in which the Supreme Court reviewed the history of the fair comment privilege and its development as an exemption from defamation liability, and *Keohane v. Stewart*, 882 P.2d 1293, 1298 (Colo. 1994), *cert. denied*, 513 U.S. 1127, 115 S. Ct. 936, 130 L. Ed. 2d 882 (1995), in which the Colorado Supreme Court did the same.

I begin with Colorado law, which the parties agree applies to this case. The fair comment principle is now embodied in Section 566 of the Restatement. "A defamatory communication may consist of a statement in the form of an opinion, but a statement of this nature is actionable only if it implies the allegation of undisclosed defamatory facts as the basis for the opinion." Restatement (Second) of Torts § 566 (1977). Colorado employs the Restatement rule. *Keohane*, 882 P.2d at 1298. I discern whether a statement implies undisclosed defamatory facts using a bipartite test. First, I am to resolve whether the statement is sufficiently factual to be susceptible of being proved true or false. *Keohane*, 882 P.2d at 1299. *See also*, *Schwartz v. Am. College of Emergency Physicians*, 215 F.3d 1140, 1146 (10th Cir. 2000) (applying New Mexico law). Second, I judge whether reasonable people would conclude that the assertion is one of fact according to three factors: 1) how the assertion is phrased; 2) the context of the entire statement; and 3) the circumstances surrounding the assertion, including the medium through which the information is disseminated and the audience to whom the statement is directed. *Keohane*, 882 P.2d at 1299; *Arrington v. Palmer*, 971 P.2d 669, 672 (Colo. App. 1998). *See also*, *Schwartz*, 215 F.3d at 1146.

As more fully set forth below, Aetna's evaluation of TMJI's devices as experimental and

12

investigational is not capable of being proved false. Rather, that characterization depends upon many factors, only some of which are susceptible of empirical verification.

I also find and conclude that a reasonable person reading CPB 28 would conclude that Aetna's assertions constitute its own opinion and not recitations of fact. The statements were phrased as evaluations of TMJI's devices and appear within the context of Aetna's explanation for its various coverage denials. They follow a disclaimer characterizing them as matters of opinion. Therefore, the phraseology suggests that they are opinions. The context and circumstances of the communication commend the same conclusion. As TMJI has alleged, the primary purpose of CPB 28 is to explain Aetna's approval or denial of coverage for various temporomandibular therapies. CPB 28 is published to Aetna's customers and to health care providers as one of many such evaluative notices. A reasonable reader approaching CPB 28 encounters Aetna's considered evaluations of various devices and procedures; the parties have suggested no other reason why readers might refer to the document. Ordinary persons would consider the statements expressions of Aetna's opinion and not unambiguous statements of fact. *Contrast*, *Schwartz*, 215 F.3d at 1146.

TMJI cites *Burns* in support of its argument that statements of fact made in support of statements of opinion may serve as independent bases for defamation liability. TMJI asserts that Aetna must therefore answer for its discussion of the various studies, or lack thereof, on which it purportedly relied. However, the *Burns* case stands for a very different rule. The court there stated,

> We believe that opinions which imply the existence of an undisclosed defamatory factual predicate may support a cause of action in defamation. If a listener cannot evaluate the alleged defamatory language because no basis for the statement has been disclosed, a

13

defamation action may properly be brought.

*Burns*, 659 P.2d at 1360. The court went on to hold that the speech at issue was unprotected because it was "not supported by disclosed facts or circumstances which would allow an average listener to evaluate the purported opinion." *Id*. *Contrast*, *NBC Subsidiary (KCNC-TV) v. Living Will Ctr.*, 879 P.2d 6, 12 (Colo. 1994).

TMJI's proposed reading of *Burns* would torture the text and holding of the decision with a curious result. Aetna would be deterred from disclosing the factual bases for its opinion for fear of forfeiting its fair comment privilege. Yet Aetna may enjoy the privilege only if it discloses the underlying facts. I can make no sense of a rule that takes with one hand what it gives with the other. Indeed, TMJI's proposal would put Aetna and similarly-situated declaimers in a bind; by disclosing those facts that its customers would find most useful in measuring the reliability of its opinion, as it has done here, Aetna would actually subject itself to liability. I find nothing in the law or in logic that commends that rule. To the contrary, Colorado's fair comment privilege requires dismissal of TMJI's defamation and commercial disparagement claims.

In addition, Aetna enjoys the protection of the First Amendment. As the Supreme Court stated in Milkovich, "a statement of opinion relating to matters of public concern which does not contain a provably false factual connotation will receive full constitutional protection." *Milkovich*, 497 U.S. at 20. As TMJI alleged in its Amended Complaint and conceded in its brief, the efficacy of implanting TMJI devices is a matter of public concern. Amended Complaint ¶ 39; TMJI Response, 24. Aetna's statement are actionable, therefore, only if they connote provably false facts.

In *Milkovich*, the Supreme Court explained that it had recognized no "wholesale

14

defamation exemption for anything that might be labeled 'opinion.'" *Milkovich*, 497 U.S. at 18.

> If a speaker says, "In my opinion John Jones is a liar," he implies a knowledge of facts which lead to the conclusion that Jones told an untruth.  Even if the speaker states the facts upon which he bases his opinion, if those facts are either incorrect or incomplete, or if his assessment of them is erroneous, the statement may still imply a false assertion of fact.  Simply couching such statements in terms of opinion does not dispel these implications; and the statement, "In my opinion Jones is a liar," can cause as much damage to reputation as the statement, "Jones is a liar."  As Judge Friendly aptly stated: "[It] would be destructive of the law of libel if a writer could escape liability for accusations of [defamatory conduct] simply by using, explicitly or implicitly, the words 'I think.'"  *See* [*Cianci v. New Times Pub. Co.*, 639 F.2d 54, 64 (2d Cir. 1980)].  It is worthy of note that at common law, even the privilege of fair comment did not extend to "a false statement of fact, whether it was expressly stated or implied from an expression of opinion."

*Id.* at 18-19.

The Tenth Circuit offers guidance in applying the *Milkovich* rule.  In *Jefferson County Sch. Dist. No. R-1 v. Moody's Investor's Servs.*, 175 F.3d 848, 853 (10th Cir. 1999), the court distinguished evaluative opinions, which rely at least in part upon premises not provably false and enjoy First Amendment protection, from deductive opinions, the premises of which all may be proven false.

Aetna sets out in CPB 28 a list of factors on which it relies in making its coverage decisions.  Some, such as the "regulatory status of the technology," "evidence-based guidelines of public health and health research agencies," and "evidence-based guidelines and positions of leading national health professional organizations" can be verified with reference to empirical data.  Others, such as "clinical outcome studies in the peer-reviewed published medical literature," "views of physicians practicing in relevant clinical areas," and "other relevant factors," cannot.  Because the resulting opinion depends, at least in part, on factors not provably true or false, the opinion is not provably false and is thus protected.  *Moody's Investor's*, 175 F.3d at 855.

I briefly deal with several other arguments that TMJI has put forward. Citing *Heasley v. Belden & Blake Corp.*, 2 F.3d 1249, 1262 (3d Cir. 1993) and similar cases, TMJI points out that the words "experimental" and "investigational" are terms of art, susceptible of concrete definition. The terms, TMJI argues, "are not so mystical and ill-defined as Aetna claims." TMJI Response, 12. This argument misses the point. The court in *Heasley* was charged with defining the term "experimental" for the purpose of deciding whether an employer had impermissibly denied coverage for a procedure. *Id*. at 1251. That Aetna's statement might, in other contexts, possess legal significance does not mean that it is fact rather than opinion. *See Moody's Investor's*, 175 F.3d at 853. For the same reason, whether Aetna's statements are (as TMJI puts it) "fuzzy," "vague," or "indefinite" is irrelevant.

TMJI argues that Aetna's finding of inadequate evidence of the safety and effectiveness of the devices, while subjective, might run contrary to objective determination of the question and is therefore unprotected. It queries, "If 99 studies support a medical device's safety and effectiveness and one study does not, can an insurer, consistent with legal obligations to exercise reasonable care toward the rights of third parties, simply cross its arms and say the 99 to 1 evidence ratio still is 'inadequate'?" TMJI Response, 18. Aetna's physical posture notwithstanding, whether Aetna's evaluation was fair is not the question currently before me. I note, as an aside, that TMJI has not alleged that 99 per cent of peer-reviewed studies contradict the Wolford and Laskin studies; if 100 per cent of two studies fails to establish the safety and effectiveness of the device to Aetna's satisfaction, then Aetna is hardly demonstrating a bias contrary to objective considerations.

TMJI doubts that Aetna can establish the truth of its evaluation by relying upon the

16

Wolford study. Having thus established the straw man, TMJI obliterates it; Aetna fails to identify the assumptions and data on which the study relies and with which TMJI takes issue. The question before me, however, is not whether the Wolford study is reliable but rather whether Aetna's determination that TMJI's products are experimental and investigational is, in the first place, protected speech.

Alternatively, TMJI's argument might be read to mean that Aetna may not benefit from First Amendment protection because the Wolford study sets forth only those facts favorable to its conclusion and omits some unidentified, contrary facts. In other words, Aetna is unprotected because it failed to disclose the full universe of relevant information. However, no authority appears for that novel proposition and I see no reason to adopt such a rule in this case.

Covering its bases, TMJI also argues that Aetna provided *too much* information. Aetna would have acted permissibly, TMJI argues, if it had merely denied coverage for implantation of the device and not labeled the device experimental and investigational. It continues, "By analogy, an auto insurer can, as a matter of contract, decide it will not insure Ford vehicles, but if it takes the next step and justifies the decision with the untrue statement 'because all Fords explode on impact,' the auto insurer has defamed and disparaged Ford Motor Company." TMJI Response, 8. If TMJI intends by this to argue that Aetna has made a defamatory factual statement, that argument is answered above. If, instead, it takes issue with Aetna's decision to provide support for its opinion with resort to the Wolford study, I am at a loss to determine what doctrine TMJI is trying to advance. TMJI does not explain by what alternative means Aetna might reveal the grounds for its no-coverage decision.

TMJI interprets the opinion that its product is experimental and investigational to mean

17

that its product "doesn't work." As TMJI reads it, "Aetna's bulletin is phrased as a form of double negative; to say that there is a 'lack of clinical data on its safety and effectiveness' is the same as saying it is unsafe and ineffective." TMJI Response, 17. That, quite simply, is not true. *Neurotron*, 254 F.3d at 449. Aetna has withheld judgment on the safety and effectiveness of TMJI's products and so cannot be said to have implied a deficiency in the devices. Indeed, TMJI elsewhere concedes, "Aetna does not overtly fault TMJI's devices as contrary to sound medical practice or claim that they violate any medical standards... ." TMJI Response, 19.

**B.   CIGNA Defendants' statements**

For the same reasons, the CIGNA Defendants' statements also constitute protected, evaluative opinions. TMJI takes issue with the addition of the word "unproven." That word, however, is equally evaluative as the words "experimental" and "investigational;" implicit in the phrase is that the safety and effectiveness of the partial prosthesis is insufficiently proven *to the CIGNA Defendants*.

TMJI also objects to CIGNA's use of the passive voice. By stating that the device "is considered experimental, investigational or unproven," TMJI argues, CIGNA implied that not just CIGNA but the entire medical community so views the device. However, the text does not fairly admit that reading. The entire sentence is, "CIGNA HealthCare does not cover partial joint replacement with the Christensen Fossa Eminence Prosthesis (TMJ Implants, Inc.) Partial TMJ Replacement System because it is considered experimental, investigational or unproven." Within context, the statement clearly is intended to support CIGNA's decision not to cover the device and so must be taken as CIGNA's opinion.

18

**C.      Tortious interference claims**

Having determined that the defendants wrote protected speech I am constrained to hold that their statements were not improper and therefore cannot give rise to claims for interference with TMJI's contracts and prospective business relationships. *Moody's Investor's*, 175 F.3d at 858; *Krystkowiak v. W.O. Brisben Cos.*, 90 P.3d 859, 872 (Colo. 2004); *Amoco Oil Co. v. Ervin*, 908 P.2d 493, 502 (Colo. 1995).


Accordingly, it is ORDERED that:

1) the defendants' motions to dismiss are GRANTED; and

2) judgment shall enter in favor of all defendants on all counts with costs.

Dated: December   13  , 2005, in Denver, Colorado.

                                                        BY THE COURT:


                                                           s/Lewis T. Babcock
                                                        Lewis T. Babcock, Chief Judge